

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-24-00097-CV

_____


THE STATE OF TEXAS FOR THE BEST INTEREST AND PROTECTION OF S.S.


On Appeal from the County Court at Law No. 2
Hunt County, Texas
Trial Court No. M-12742


Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

MEMORANDUM OPINION

On November 25, 2024, the County Court at Law No. 2 of Hunt County ordered that S.S. be temporarily committed to Glen Oaks Hospital, a mental-health facility, for a period of no longer than forty-five days. On the same date, the trial court also entered a temporary order to administer psychoactive medication to S.S.

On appeal, S.S. argues that the evidence was legally and factually insufficient to support her involuntary commitment order and the order to administer psychoactive medication. We conclude that legally and factually sufficient evidence supported the trial court's temporary orders and affirm them.

## I.     Relevant Statutes and the Standard of Review

"[A] State cannot constitutionally confine[,] without more[,] a nondangerous individual who is capable of surviving safely in freedom by [her]self or with the help of willing and responsible family members or friends." *State ex rel. H.S.*, 484 S.W.3d 546, 549 (Tex. App.—Texarkana 2016, no pet.) (alterations in original) (quoting *State ex rel. S.W.*, 356 S.W.3d 576, 579 (Tex. App.—Texarkana 2011, no pet.)). "The requirements for an involuntary commitment are strict because an involuntary commitment is a drastic measure." *Id.* (quoting *State ex rel. S.W.*, 356 S.W.3d at 579). Accordingly, "[t]he evidentiary standards for involuntary commitment are high." *Id.* (quoting *State ex rel. E.E.*, 224 S.W.3d 791, 794 (Tex. App.—Texarkana 2007, no pet.)).

Pursuant to Section 574.034 of the Texas Health and Safety Code,

(a)    The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:

(1)    the proposed patient is a person with mental illness; and

(2)    as a result of that mental illness the proposed patient:

(A)    is likely to cause serious harm to the proposed patient;

(B)    is likely to cause serious harm to others; or

(C)    is:

(i)    suffering severe and abnormal mental, emotional, or physical distress;

(ii)    experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii)    unable to make a rational and informed decision as to whether or not to submit to treatment.

TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (Supp.).

"The State ha[s] the burden of establishing the Section 574.[034 statutory] grounds 'by clear and convincing evidence, meaning that "degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."'" *State ex rel. H.S.*, 484 S.W.3d at 550 (quoting *State ex rel. L.T.*, 386 S.W.3d 271, 275 (Tex. App.—Texarkana 2012, no pet.)). "To be clear and convincing under Subsection (a), the evidence must include expert testimony . . . ." TEX. HEALTH & SAFETY CODE ANN.

3

§ 574.034(d) (Supp.). Also, unless waived, there must be "evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function." *Id.*

S.S. does not challenge the finding that she is mentally ill. Instead, she argues that the evidence is not legally or factually sufficient to support the trial court's Section 574.034(a)(2) findings. In both a legal and factual sufficiency review, "[t]he fact-finder is the only judge of witness credibility and weight to give to testimony." *State ex rel. H.S.*, 484 S.W.3d at 550 (quoting *State ex rel. L.T.*, 386 S.W.3d at 274). "This Court '"cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement," but when the evidence allows only one inference, "the reviewing court may [not] disregard it."'" *Id.* (alteration in original) (quoting *State ex rel. L.T.*, 386 S.W.3d at 274).

"In reviewing legal sufficiency, we analyze '"whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."'" *Id.* (quoting *State ex rel. L.T.*, 386 S.W.3d at 274). "We are to consider all of the evidence in the light most favorable to the verdict, indulging every reasonable inference that would support it." *Id.* (quoting *State ex rel. L.T.*, 386 S.W.3d at 274).

As for factual sufficiency, "we review all the evidence in the record, both in support of and contrary to the trial court's findings." *State ex rel. S.K.*, No. 06-13-00023-CV, 2013 WL 1867626, at *2 (Tex. App.—Texarkana May 3, 2013, no pet.) (mem. op.). "We consider

whether the disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in favor of its finding." *Id.* (citing *State ex rel. L.T.*, 386 S.W.3d at 274).

## II.      Evidence From the Commitment Hearing

At the beginning of the hearing, and without objection, the trial court took judicial notice of two certificates of medical examination for mental illness. Dr. Raza Sayed, a board-certified psychiatrist who had filed one of the certificates, was present at the hearing. Dr. Sayed testified that he completed a psychiatric evaluation of his patient, S.S., on November 13, 2024, after she was brought to the hospital. According to Dr. Sayed, S.S., who was sixty-three years old, had "[b]ipolar disorder, mania, with psychosis" and presented with symptoms of aggressive behavior, paranoid thoughts, irritability, and insomnia.

Dr. Sayed testified that S.S. spoke of the Illuminati, believed that people were trying to hurt her, and "acted out aggressively at home towards her boyfriend in the belief that he was part of the Illuminati." He explained that S.S. "was using a hammer to go after her boyfriend, and she had overt acts of aggression at home." Those acts included putting holes in her wall because she believed there was a cat in the wall and could feel its fur. According to Dr. Sayed, S.S. "claimed that people in [the] hospital lobby were choking her," which indicated delusion. Because S.S. was "essentially defending herself from people [she believed were] trying to hurt her by acting out violently," Dr. Sayed was concerned for the safety of the people around S.S. if she did not receive proper treatment.

Dr. Sayed testified that he visited with S.S. every other day. According to Dr. Sayed, S.S. was "not able to maintain a coherent thought process" when he explained why she was

5

admitted to the hospital, believed she was the Queen of England, and said she did not have to answer to anyone. As a result, he testified that, because S.S. had no understanding or insight into her mental illness, she could not make an informed decision as to whether to submit to mental-health treatment.

During S.S.'s hospitalization, Dr. Sayed noticed that S.S. required prompting to eat her meals and was only "eating anywhere between 10 to 40 percent of her meals" because fasting was "part of her psychosis." According to Dr. Sayed, S.S. did not take her medication consistently and was suffering as a result. He said that S.S. slept only one or two hours a night or not at all. Also, S.S. engaged in pacing while mumbling and whispering to herself but denied seeing or hearing voices.

Dr. Sayed testified that S.S. was easily irritated and got "into the personal space of other patients and staff who [were] attempting to assist her." While she was argumentative, Dr. Sayed clarified that S.S. had not "physically laid hands on anyone" at the hospital and instead showed "[m]ostly verbal aggression, body posturing."

Dr. Sayed testified that hospitalization not exceeding forty-five days was the least restrictive option for treating S.S.'s mental health and that out-patient treatment would be needed once S.S. was stabilized and showed that she could take medications consistently. He added that S.S. would suffer "[c]ontinued deterioration and continued risk of aggression toward others" if not properly treated, but that her prognosis was good if she submitted to treatment with psychotropic medications that would stabilize her mood and reduce her paranoia.

The trial court next heard from S.S., who testified that she was in the hospital since October 13, instead of November 13, and claimed that she was in the hospital for Halloween. When asked why she was admitted, S.S. said,

> There was a kitten in the wall because of the producers because we were filming Ren & Stimpy in my house, and so in order not to disturb [the boyfriend], I went into the living room, and he was asleep because I knew he would freak out if I put a hole in the wall.
>
> So I went and got a ha[mm]er and started digging down because I knew there was a gas line behind, so I didn't want to pound a hammer on it.

S.S. said that her boyfriend began choking her and that she defended herself because she believed he would kill her. She added, "When I got whisked away, I didn't know I was coming there. I thought I was going to go down to Dwayne's house, who was and is now the president of the Illuminati, and they were hazing me for six months."

S.S. said that she had a psychiatrist, Suzanne Adams, but "fired [her] . . . because she was on drugs." S.S. testified that she was in a fight in the hospital and had damage to her neck, collarbone, ribs, and "kept asking for an ambulance," which did not come. She also claimed that another patient stole her clothing.

S.S. testified that she had "[post-traumatic stress disorder], anxiety, panic attacks, and major depressive disorder" and took Bupropian, Duloxetine, BuSpar, Xanax, Lisinopril, Pravastatin, Pantoprazole, and Propranolol. According to S.S., the hospital was not giving her medication. She said that she was not diagnosed with bipolar disorder before her hospitalization and wanted to be released. Even so, S.S. admitted, "I know I need some psychotherapy; I do."

Although her boyfriend was no longer with her, S.S. said that she had brothers who could care for her.

After hearing this evidence, the trial court found that S.S. was a "person with mental illness, that [she was] likely to cause serious harm to herself or others, and that the least restrictive period of treatment [was] inpatient treatment for a period not to exceed 45 days."

### III. Legally and Factually Sufficient Evidence Supports the Temporary Orders

S.S.'s appellate challenge focuses on the trial court's finding that she was likely to cause serious harm to others. While the evidence at trial established that she attacked her boyfriend with a hammer before being hospitalized, S.S. argues that the evidence is insufficient to show that she would harm others based on recent overt acts. In support, she cites to Dr. Sayed's testimony that she had not physically laid hands on anyone during her hospitalization and instead exhibited only verbal aggression and body posturing. As a result, S.S. believes that the evidence is insufficient to support the trial court's finding under Section 574.034(a)(2) of the Texas Health and Safety Code.

We disagree with S.S.'s reasoning. First, S.S. cites no authority for her conclusion that the attack on her boyfriend was not recent enough to constitute a recent overt act under the statutory language. Rejecting a similar argument, our sister courts have found that an act of violence predating hospitalization meets the requirement of a recent overt act under Section 574.034(d) of the Texas Health and Safety Code. *State ex rel. C.G.*, No. 13-22-00501-CV, 2022 WL 17844128, at *4 (Tex. App.—Corpus Christi–Edinburg Dec. 22, 2022, no pet.) (mem. op.); *J.S. v. State*, Nos. 01-12-00096-CV & 01-12-00097-CV, 2012 WL 3776980, at *3 (Tex. App.—

8

Houston [1st Dist.] Aug. 30, 2012, no pet.) (mem. op.). Likewise, we find that evidence of the November 13 act of physical violence against her boyfriend was a recent overt act confirming that a likelihood of serious harm to others existed during the November 25 hearing.

Moreover, while Dr. Sayed's testimony of S.S.'s verbal aggression and body posturing did not show that S.S. physically assaulted anyone during hospitalization, "Texas law does not require relatives or physicians of the mentally ill (or the courts) to stand idly by until serious harm occurs. Indeed, the purpose of temporary commitment is to avoid such harm." *State ex rel. C.G.*, 2022 WL 17844128, at \*4 (quoting *G.H. v. State*, 94 S.W.3d 115, 117 (Tex. App—Houston [14th Dist.] 2002, no pet.)). Dr. Sayed's expert testimony showed that S.S.'s mental health was deteriorating and that she was still suffering from delusions. S.S.'s own testimony established her condition. It demonstrated that S.S. could not tell how long she was hospitalized, believed the Illuminati was after her and believed she had been attacked at the hospital.[1] The evidence of S.S.'s continued delusions and aggressive mannerisms, in addition to the past overt act of physical violence against her boyfriend, supported Dr. Sayed's "concern[] for the safety of people around her if left untreated" and the conclusion that S.S.'s delusions were likely to result in her defending herself by acting out violently, as she already had before.[2]

We find that, even when viewing all the evidence in a neutral light, a fact-finder could rationally determine that S.S. was likely to cause serious harm to others as a result of her mental

---

[1]S.S. was starving herself, a symptom of her psychosis. She also exhibited paranoia, was only sleeping one or two hours a day, and was not taking her medications as required. This evidence shows that, due to her mental illness, S.S. was unable to provide for her basic needs, compromising both her physical and mental health.

[2]Dr. Sayed's testimony shows that S.S. was not able to maintain a coherent thought process when he was trying to explain why she was hospitalized and that, as a result, she was unable to make a rational or informed decision as to whether to submit to treatment.

illness. We further find that there was an overt act supporting the trial court's finding under Section 547.034(d) and that Dr. Sayed's testimony about S.S.'s condition while in the hospital demonstrated a continuing pattern of behavior confirming her distress and the deterioration of her ability to function. Accordingly, we find that the trial court's temporary involuntary commitment order was supported by legally and factually sufficient evidence.[3]

Next, a "court may issue an order authorizing the administration of one or more classes of psychoactive medication to a patient who . . . is under a court order to receive inpatient mental health services." TEX. HEALTH & SAFETY CODE ANN. § 574.106(a)(1) (Supp.). S.S. argues that the trial court erred by entering a temporary order to administer psychoactive medication. However, her sole argument on this point alleges that the order was erroneous because the "trial court erred in ordering temporary inpatient mental health services." Because we find that the order for temporary involuntary commitment was proper, we overrule S.S.'s point of error related to the temporary administration of psychoactive medication.

## IV. Conclusion

We affirm the trial court's temporary orders of S.S.'s involuntary commitment and administration of psychoactive medication.

Charles van Cleef
Justice

Date Submitted:     December 31, 2024
Date Decided:       January 8, 2025

---

[3]Although S.S. believed that she did not require in-patient treatment because her family members could care for her, none of her family members testified, and S.S.'s mental deterioration was evident at the time of the hearing. As a result, the trial court could have determined that S.S.'s claim that there was someone to properly care for her lacked credibility.

10